UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| CYNTHIA A. MADGWICK, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. |
| § | 5:05-CV-132-C |
| § | ECF |
| JO ANNE B. BARNHART, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

**REPORT AND RECOMMENDATION**

Plaintiff Cynthia A. Madgwick seeks judicial review of a decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB). The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this case to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. After reviewing the administrative record and the arguments of both parties, this court recommends that the District Court reverse and remand the Commissioner's decision.

**I.    Facts**

Madgwick applied for DIB on August 25, 2001, alleging that she suffered from a number of injuries and illnesses that prevented her from working. (Tr. 91-104.) Prior to applying for DIB Madgwick worked in a hospital radiology department as a support services supervisor, and she claims that her disability was caused by two on-the-job injuries she

sustained in that position. (Tr. 55, 64, 108-12.) The first injury occurred on July 6, 1999, when Madgwick injured her left hip and leg and lower back while moving a file cabinet. (Tr. 385.) She reported that she felt a "pop" in her left hip which was followed by a stinging and pulling feeling that extended into her leg. After the incident she continued to experience pain but continued working. (Tr. 108.) She was injured again on October 7, 1999, after she pulled open a drawer in a file cabinet with her right hand and the file cabinet and boxes fell toward her and pulled her arm and twisted her body. (Tr. 109.) She reported that she felt pain in her right hand, arm, and shoulder which radiated down her back and into her right leg. (Tr. 386.) She also claimed that the pain from her first injury resurfaced with the pain from the second injury. (Tr. 526.) She continued to work in a light duty capacity despite experiencing pain, severe headaches, and difficulty sleeping but quit working in November 1999. (Tr. 110.)

James Woessner, M.D., treated Madgwick after her injuries and noted that she was fragile as a result of repeated injuries and compared treating her condition to "gluing a chair leg with Elmer's glue and repeatedly jarring it loose making subsequent healing and correction more and more difficult." (Tr. 529-30.) He also noted that she had a complex psycho physiological connection of problems that had not been identified as malingering. (Tr. 389.) Madgwick was subsequently diagnosed with post-traumatic fibromyalgia and myositis (inflammation of the muscles). (*See, e.g.,* Tr. 181, 408, 788-89.) Physicians also diagnosed other illnesses including asthma; adrenal gland insufficiency with low cortisol levels; degenerative arthritis; leukocytosis; coronary artery disease; major depressive

2

disorder; sleep apnea; and narcolepsy. (Tr. 298, 320, 338, 619-20, 671-72, 756-66, 837, 868.) Madgwick has also been treated and hospitalized for pneumonia and has undergone a number of cardiac procedures including catheterization in October 2002 and April 2003 and coronary artery bypass in October 2003. (Tr. 320, 338, 620, 868.)

The Administrative Law Judge (ALJ) acknowledged Madgwick's medical history and determined that many of her illnesses were severe impairments. However, he determined that she retained the capacity to perform work involving routine job instructions and that do not require independent judgment and that would be performed in a clean atmospheric environment. (Tr. 24.) Based on the residual functional capacity determination, a vocational expert identified three jobs Madgwick could perform. She identified two jobs that are unskilled and performed at the light exertional level and one job that is unskilled and performed at the sedentary exertional level. (Tr. 26.) The ALJ then determined that Madgwick was not disabled and not entitled to DIB. (Tr. 26-27.)

## II.   Standard of Review

Judicial review of the Commissioner's denial of disability benefits is statutorily limited to determining whether the Commissioner's decision is supported by substantial evidence and whether proper legal standards were used to evaluate the evidence. 42 U.S.C. § 405(g); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence that a reasonable mind might accept as adequate to support the Commissioner's decision. *Watson*, 288 F.3d at 215 (citation omitted).

The substantial evidence standard requires more than a "simple search of the record for isolated bits of evidence" that would support the Commissioner's decision; the record must be considered as a whole. *Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986) (citation omitted). Accordingly, a court must "take into account whatever in the record fairly detracts" from the supporting evidence. *Id.* (quotation omitted).

### III.   Discussion

Madgwick argues that the ALJ committed a number of errors that warrant reversal of the Commissioner's decision. Madgwick's first two arguments, which concern the ALJ's analysis of physician opinion and residual functional capacity determination, have merit.

The ALJ's analysis of opinions offered by Madgwick's treating physicians detract from his decision. Madgwick's treating cardiologist, treating neurologist, treating psychologist, and primary care physician were all of the opinion that she was unable to maintain employment. (Tr. 188, 318, 846-47, 902, 1032, 1113.) Terry Gage, M.D., Madgwick's primary care physician, indicated in a questionnaire that Madgwick was moderately to severely limited in her ability to meet non-exertional requirements of work. (Tr. 1112.) He noted that Madgwick had "severe problems" including coronary artery disease, severe fibromyalgia, and narcolepsy and that she was unable to work. (Tr. 1113.) The ALJ acknowledged Dr. Gage's opinion but rejected it in conjunction with his analysis of an opinion from Addison E. Gradel, Ed.D., who examined Madgwick for the purpose of determining the severity and limitations related to her mental impairments. (Tr. 23-24.) In regard to Dr. Gage's assessment, the ALJ noted that there was no evidence that Dr. Gage

4

performed appropriate testing to reach his conclusions or that he would be qualified to perform such testing. (Tr. 24.)

Because a treating source is considered to be familiar with a claimant's impairments, treatments, and responses, his opinion should be accorded great weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995)); *Greenspan v. Shalala* 38 F.3d 232, 237 (5th Cir.1994). Under the holding in *Newton*, in the absence of medical evidence in the record that would controvert the opinion of the claimant's treating physician, the ALJ may reject treating physician opinion only if he analyzes it under the criteria set forth under 20 C.F.R. § 404.1527(d). The ALJ must consider: (1) the length of the treating relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) whether the physician provides medical evidence to support his opinion; (5) whether the opinion is consistent with the record as a whole; and (6) the specialization of the treating physician. *Id*. (citing  20 C.F.R.§§ 404.1527(d)).

The ALJ's analysis of the opinions offered by Dr. Gage fell short of the requirements of *Newton* and his reason for not according controlling weight to the opinion is not supported by substantial evidence. The ALJ did not point to evidence that controverted Dr. Gage's opinion. Although the ALJ discussed Dr. Gradel's opinion, which would support a finding that Madgwick's depression was not disabling, Dr. Gage's opinions were based in part on diagnoses of coronary artery disease and fibromyalgia. (Tr. 1113.)  Further, the ALJ did not analyze the opinion under the regulatory factors. (Tr. 23-14.)

Finally, rather than controverting evidence, there is evidence in the records that

5

supports Dr. Gage's opinion. Several of the opinions that Madgwick is disabled, including the opinions offered by Dr. Gage, are based in part on the fact that Madgwick had narcolepsy. (Tr. 1113.) Madgwick was diagnosed with narcolepsy by neurologist Russell C. Packard, M.D., who treated Madgwick's condition with an anti-seizure drug. (Tr. 796-97, 963-66.) Even if it were assumed that Dr. Gage was not qualified to assess and determine the limitations caused by Madgwick's narcolepsy, Dr. Packard, as a neurologist and a physician who had treated Madgwick for a period of several years, was qualified to make such an assessment, and he was in agreement with Dr. Gage in regard to Madgwick's disability. Dr. Packard reported that Madgwick suffered from "daily sleep attacks" that were more pronounced when she was anxious or under stress and that she was unable to work. (Tr. 846.) Likewise, Madgwick's psychologist, Patrick Randolph, Ph.D., believed that Madgwick's narcolepsy was a serious impediment to her ability to work. He noted that Madgwick's narcoplepsy was a "significant aspect of her current disability" and that he believed she would have difficulty finding and consistently maintaining employment. (Tr. 847, 902.) He reported that he had observed Madgwick undergo bouts of narcolepsy, that Madgwick's son reported to him that he had observed his mother undergo bouts of narcolepsy, that Madgwick had been consistent with her accounts of narcolepsy during her course of treatment, and that he had "no doubt" that she experienced narcolepsy that was debilitating. (Tr. 902.)

The ALJ rejected the opinions offered by Madgwick's physicians noting that they were "not entirely supported by the objective evidence or consistent with it" and that

6

conclusory statements regarding disability are not considered medical opinion. (Tr. 24.) Again, the ALJ's analysis falls short of the requirements of *Newton*. The ALJ did not identify evidence that would controvert the many opinions offered by Madgwick's physicians nor did he explain how the evidence did not support the opinions. Without such analysis, it should not be found that the ALJ showed good cause for rejecting the opinions of Madgwick's treating physicians. *See Loza v. Apfel*, 219 F.3d 378, 395-96 (5th Cir. 2000) (An ALJ who does not accord controlling weight to the medical opinion of a treating physician must always give good reason for not doing so in the notice of determination.).

Further, although the regulations required him to do so, the ALJ did not consider the effects of Madgwick's narcolepsy when he determined her residual functional capacity. Under 20 C.F.R. § 404.1545, the ALJ must consider the limiting effects of all the claimant's impairments when determining the claimant's residual functional capacity. 20 C.F.R. §§ 404.1545(e) (2005). He must consider evidence such as the claimant's descriptions of his or her limitations and observations of such limitations by the claimant's treating or examining physicians, psychologists, family, friends, or other persons. 20 C.F.R. § 404.1545(a)(3). This evidence must be considered along with the medical evidence to determine the extent of a claimant's limitations. *Id.* The ALJ acknowledged some of the evidence in the record regarding Madgwick's narcolepsy but did not specifically discredit the evidence. Rather, he rejected all of Madgwick's subjective allegations by stating in conclusory fashion that her "reported limitations, both mental and physical, are out of proportion to the objective evidence and the findings on physical and mental status

7

examinations." (Tr. 24.) Madgwick's treating physician, treating neurologist, and treating psychologist were in agreement that she suffered from narcolepsy that was disabling. (Tr. 846-47, 902, 1113.) Despite the agreement among the physicians the ALJ did not consider or discuss the limitations, if any, Madgwick's narcolepsy would have on her ability to work and did not include any limitations in the residual functional capacity determination that would accommodate her narcolepsy. These omissions detract from the ALJ's ultimate decision. *Singletary*, 798 F.2d at 822-23.

## IV.    Recommendation

Based on the foregoing discussion of the issues, evidence and the law, this court recommends that the United States District Court reverse and remand the Commissioner's decision for further administrative proceedings.

## V.    Right to Object

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within ten days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within ten days shall bar such a party, except upon grounds of plain error, from attacking on appeal the factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

Dated:   April 24, 2006.

                                NANCY M. KOENIG
                                United States Magistrate Judge